## Lillie A. Smith, Administratrix, v. Chicago Junction Railway Company et al.

### Gen. No. 12,519.

1. PEREMPTORY INSTRUCTION—*when giving of, proper.* The giving of a peremptory instruction is proper where there is no evidence upon which the jury might, without acting unreasonably in the eye of the law, decide in favor of the plaintiff.

2. MASTER—*not required to furnish most approved appliances.* A master is only required to exercise reasonable and ordinary care to provide reasonably suitable and safe machinery and appliances for his employees, and such machinery and appliances are not required to be of the best, most modern, or most improved kind, or absolutely safe.

3. ORDINANCE—*imposing regulations upon railroad companies with respect to switching, invalid.* Municipalities in this state are not empowered by statute to impose regulations on railroad companies in respect to switching cars in their private switching yards.

4. ASSUMED RISK—*when question of, one of law.* The facts being undisputed, it is a question of law whether an injury resulted from one of the assumed risks of the employment.

5. MOTION TO WITHDRAW JUROR—*when improperly denied.* A motion for leave to withdraw a juror is in effect a motion for a continuance and where the application is based upon inability to secure alleged material evidence, the materiality of such evidence and the diligent effort to obtain the same prior to the trial must be shown.

Action on the case for death caused by alleged wrongful act. Error to the Superior Court of Cook County; the Hon. JESSE HOLDOM, Judge, presiding. Heard in this court at the October term, 1905. Affirmed. Opinion filed May 21, 1906.

**Statement by the Court.**  Plaintiff in error sued defendant in error for damages for causing, by alleged negligence, the death of her intestate.

The declaration consists of three counts. In the first count it is averred, in substance, that February 1, 1902, the defendants possessed and were operating certain railway tracks in the city of Chicago, commonly known as transfer tracks, in a switch yard, in which were divers railway switches, frogs and tracks, which tracks crossed and interlaced, and that a large number of freight cars and engines were constantly moved to and fro on said tracks; that John J. Gallagher was in the employ of the Chicago Junction Railway Company as a switchman, and his duties required him to walk along said tracks while cars and engines were moving thereon, both toward and from him, and it was his duty to walk on said tracks between moving freight cars, in the space between said cars, which space was not more than three feet wide. February 1, 1902, he was performing his duties as switchman, at eleven o'clock in the evening, while a snow storm was raging so violently as to confuse the faculties and impair the vision of all persons working in said yards, and it was the duty of the defendants to provide a safe place for said Gallagher to work under said circumstances and conditions. "And the plaintiff avers that the defendants then and there carelessly and negligently failed to perform said duty, but, on the contrary, permitted ends of two rails to be within the outer

rails of a track upon which the said John J. Gallagher was then walking along and upon, which constituted what was then and there known as a switch; and the defendants then and there permitted the ties upon which said track so laid, for the distance of, to wit, twenty feet easterly of said switch, to rise and project above the surface of the ground, although, both to the eastward and the westward of said space, the ground was then and there even with the top surface of said ties; and then and there omitted to maintain a lamp upon the switch lever, to give warning in the darkness and driving snow, which then and there existed, of the location of said switch, all of which then and there rendered said track an unsafe place for the *defendant* to walk upon in the discharge of his duties." (The word "defendant" instead of deceased, is evidently a clerical error.) It is then averred that while Gallagher was performing his duties, and exercising ordinary care, and while he was walking along said tracks, he tripped on some one of said obstructions and stumbled and fell on the track, and one of the cars moving along the track passed over him and killed him.

We cannot distinguish any substantial difference between the first and second counts.

The third count sets up an ordinance of the city of Chicago providing : "Every locomotive engine, railroad car, or train of cars, running in the night time on any railroad track in said city, shall have and keep, while so running, a brilliant and conspicuous light on the forward end of such locomotive engine, car or train of cars. If such engine or train be backing, it shall have a conspicuous light on the rear car or engine, so as to show the direction said car is moving." It is then averred that Gallagher was injured in the night time, and that the car by which he was injured was a freight car running on a railroad track in said city, and that, by reason of the negligence of the defendants to comply with said ordinance, a car ran over and killed him. The declaration is in the usual form in such cases as the present.

The defendants pleaded the general issue. The court, at the close of the plaintiff's evidence, instructed the jury to find the defendants not guilty, which the jury did, and judgment was rendered against the plaintiff.

SAMUEL B. KING and JULE F. BROWER, for plaintiff in error.

WINSTON, PAYNE & STRAWN, for defendants in error.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

The court having taken the case from the jury, by an instruction to find the defendants not guilty, the main question to be decided is, whether the evidence, with all inferences which may legitimately be deduced from it, fairly tends to support the plaintiff's case, as stated in the declaration. Not whether there is a mere scintilla of evidence, but whether there is "evidence upon which the jury could, without acting unreasonably in the eye of the law, decide in favor of the plaintiff." Offutt v. Columbian Exposition, 175 Ill. 472, 474. The accident occurred in a switching yard of the Chicago Junction Railway Company. The yard lies north of and parallel with Forty-seventh street, an east and west street, and extends west from Center avenue, a north and south street. As is usual in such yards, it contains a great many tracks. It appears from a blue print in evidence that at Center avenue there are a number of main tracks running east and west, parallel and close to Forty-seventh street. That branching from said east and west main tracks in a northwesterly direction, are three main leads, from which additional switches are thrown off, making altogether sixteen leads, four of which turn due north, and twelve of which turn due west. The most southerly of the north six tracks which turn west is for the use of the Chicago & Rock Island Railroad Company, and the two tracks next north of it are for the use of the Illinois Central Railroad Company. The two rails of these three tracks converged at their eastern ends, so

that they were only a couple of inches apart, and at the point of convergence they were controlled by a switch, which led from them to the lead track from the main line. The switch is called a three-throw switch, and the following description of it, taken from the argument of counsel for defendants, is sustained by the evidence:

"The construction of the switch was simple. The rails of the three tracks running from it were spiked solid to the ties which lay under the tracks, and were consequently immovable. The single track which led to them from the lead track was not fastened to the ties for a distance of about twelve feet from its west end (the point of the switch), but was capable of being moved over the tops of the ties upon which it rested by the movement of the switch lever, so that it could be set for either one of the three tracks in question. From a point twelve feet east of the point of the switch, this single track was spiked solid to the ties, in the same manner as the other railroad tracks in the yard. The rails of this track throughout the twelve feet in which it was movable were held together by switch rods, which were clamped to the rails, and which ran from the bottom of one rail of the track to the bottom of the other rail,—straight iron rods which were there for the purpose of holding the rails at the proper distance apart, when the switch was moved; and there were three or four of these switch rods between the point of the switch and the place twelve feet east, where the rails were spiked to the ties." The switch rods being at the bottom of the rails of the moving switch, and extending from rail to rail of the switch, they slid along the surfaces of the ties, and made it necessary to remove some of the top surface of the earth or ballast, so that they could freely move from side to side. Elsewhere in the track the ground was level with the ties.

John J. Gallagher was thirty-eight years of age at the time of the accident. He was careful and temperate. His sobriety was admitted. He had been in the employ of the Chicago Junction Railway Company for about a year prior

to the accident, as a switchman, and had worked with
the same crew in the yard in question for three weeks
next before the accident, and in the same part of the
yard where the accident occurred, earlier on the day of
and before the accident. He went to work at noon,
February 1, 1902, and the accident happened on that day,
between eleven and twelve o'clock at night. The follow-
ing question was asked the conductor of the switching crew,
and answer given :

Q. "Had you been working at this particular part of
the yard at any other time during the day ?" A. "In the
early evening we had." The part of the yard referred to is
that part where the accident happened.

The switching crew consisted of the following persons :
George Shoup, the yard conductor; Jim Lynch, headman,
whose place was near the engine as it shoved the cars; John
J. Gallagher, deceased, hindman; William Klingle, engineer.

The witnesses called by the plaintiff were Lillie A. Smith,
plaintiff, George Shoup, T. J. McCarthy, yardmaster for
the Chicago & Northwestern Railway Company, and
William Klingle, the engineer. Jim Lynch died before the
trial. John J. Gallagher, deceased, was the hindman, by
which is meant the farthest from the engine when the cars
were being shoved by it along the tracks, so that he was
really in front, in relation to the direction in which the cars
moved. Shoup, the conductor, testified that Gallagher's
duties were to go down in the yard and throw the switches;
that the one farthest from the engine, when several were
being shoved, was designed for the track of the railroad
which owned that car, and it was Gallagher's duty to throw
the switch which led to that track, and so as to the remain-
ing cars which were being shoved. Witness further testi-
fied that he stood at the Center avenue crossing, at the
switch which controlled the whole yard, where he could
halloo to the hindman where the next car was coming; and
the headman, Jim Lynch, deceased, called the cars off to
the hindman; that Lynch was cutting off the cars. Shoup
testified that, about twenty-five or thirty minutes before

Gallagher's body was found, he saw him crossing from one track to another, from south to north; that he was then four or five car lengths from witness, and had a lamp in his hand, and hallooed to witness.

William Klingle, the engineer, testified that, about twenty minutes before Gallagher was injured, he saw him standing alongside of the track that leads into Packingtown, with a lamp in his hand. This is the last we learn of the deceased, from the record, before his body was found. Between the time Shoup, the conductor, saw Gallagher walking, as above stated, and the time of finding his body, they had been moving cars west. Shoup testified that he went looking for Gallagher, and he found a place where the snow had been ruffled up, and where something had been dragged, that it started leading into the Rock Island track east of the switch, and he followed it up till he found him, just before he died, between the trucks of a box car six or seven car lengths west of the three-throw switch, on the Rock Island track.

The evidence tends to prove, and counsel for plaintiff admit, that the place mentioned by Shoup where the ruffling of the snow commenced, was twenty feet east of the three-throw switch, saying, in their argument: "The snow was ruffled from a point twenty feet east of the switch nearest which he was found." Shoup testified, that while they were moving the cars west it was snowing and blowing, so that they could not see, for a while, more than four or five car lengths. The evidence is that there was no light on the rear end of the car farthest from the engine while the cars were being moved. In short, the evidence showed that, if the ordinance pleaded and put in evidence is applicable to the private switching yard of a railroad company, it was violated by the defendants. Shoup testified that it had not been customary, in similar switch yards, to carry lanterns on the rear ends; that he had worked for the Chicago Junction Railway Company for a year and one-half, or two years, next before the accident, and never saw a light carried on the rear end of a car that was being

switched in, and that the same was true during the time Gallagher worked in the yard.

Counsel for plaintiff, in their argument, rely on three things as negligence: (1) The alleged exposed ties; (2) the projecting stubs of the three-throw switch; and (3) the want of light in the rear of the rear car while being backed.

The evidence tends to prove, without contradiction, and plaintiff's counsel admit, in their argument, that the place where the deceased was knocked down was twenty feet east of the three-throw switch, and the evidence also tends to prove, without contradiction, that the rods which ran from rail to rail of the switch, and were attached to the under parts of the switch rails to keep them apart and rigid, slid along, when the switch was moved, on the surfaces of the ties, and that it was necessary to remove from the ties some of the earth or ballast in order that these rods, which held the switch rails in place, might move freely, and that, except under where the switch moved, when thrown, the ground was level. The place where the deceased fell being twenty feet east of the switch and the ties beneath it, it is manifest that neither the stubs of the switch nor the alleged exposed ties could have caused or contributed to his fall. The argument of counsel for the plaintiff is misleading, and not only so, but rather imaginative and speculative. They say: "The snow was ruffled from a point twenty feet east of the switch nearest which he was found, *which coincides with the place where the spaces between the ties were unfilled with ballast or anything else.* He very likely lost control of his movements at this point by stumbling on one of these ties, which in turn was, in all probability, caused by the moving freight car striking him. It is evident that he was not killed at that point, but *when he reached the point where the stubs projected fourteen inches into the space between* the rails, that his attempts to recover himself were wholly frustrated by the presence of these projections, which would render his struggles to regain his feet less effective."

This must have been an oversight of counsel, as on the same page they refer for the evidence to page 6 of their argument, where they say: "The ballast was removed from the spaces between the ties *at* the *switch*." The witness Shoup testified: "Where there is a switch rod connecting both rails together, the dirt has got to be dug out from underneath the switch rod, between the ties, so you can move the switch." Q. "Well, was that so on that switch?" A. "You could not move the switch if it was full of dirt." Q. "Answer my question; was that so at that switch?" A. "I didn't notice whether it was or not, that evening." Q. "Well, did you immediately before or immediately after, that evening?" A. "I didn't notice that switch particularly." Shoup is the witness on whom plaintiff's counsel rely for proof that the ballast was removed from between the ties, yet his own evidence is, in effect, that he did not know. It is certainly not a legitimate inference from the fact that after the deceased fell, in front of a moving car, twenty feet east of the switch and the ties beneath it, that he struggled to arise, but was prevented from so doing by obstacles at the switch. No verdict could stand based on such inference. It is, however, a legitimate inference that when the deceased was thrown down by the moving car, he was dragged along by it to the place where he was found, and while being so dragged was wholly unable to rise or aid himself in any way. Notwithstanding the conclusion that no obstacles at the switch could have contributed to the accident, we have carefully considered the contention of counsel for plaintiff as to the construction of the three-throw switch, and are of opinion that the evidence does not tend to prove negligence in its construction or use. Much reliance is placed on the testimony of McCarthy. He testified, in substance: I know what a stub-end, three-throw switch is. There is split switches, there is stub switches, single-throw and double-throw switches, and a three-throw switch. The split switch, when you throw it for entering for the main rail, comes close up against the main rail. There is no stub.

The stub switch is the end of the connection coming to a
stub. There is no stub on a split switch. Where the split
switch is used, the track stands unguarded on one side. On
a three-throw, stub switch, there will be two stubs stand
out, and in a split switch there is but one, which always
stands inside the running rail.

He also testified that the stub switch and split switch
are both practical, that the split switch is something new
and has been in use for ten or fifteen years in freight yards
where switching is the exclusive business, and had been
adopted in all the modern yards of the C. & N. W. Ry. Co.;
that in 1892 stub switches were used in Milwaukee, and
about fifteen per cent. of the switches used there in that
year were split switches. He was asked and answered as
follows, in reference to the three-throw switch: Q. "Is
there any device that eliminates the standing out of one of
the stubs while the running track is being used for an-
other?" A. "Well, no, sir." He also testified that it is
impossible to construct a three-throw split switch. Coun-
sel argue from this evidence that the split switch is safer,
although the witness did not so testify, and that being
safer, it was negligence of the defendants not to use it. It
is well settled that an employer is only required to exercise
reasonable and ordinary care, to provide reasonably suitable
and safe machinery and appliances for his employees, and
that such machinery or appliances are not required to be
of the best, most modern, or most improved kind, or abso-
lutely safe. Camp Point Mfg. Co. v. Ballou, 71 Ill. 417;
C., R. I. & P. R. R. Co. v. Lonergan, 118 ib. 41; Weber
Wagon Co. v. Kehl, 139 ib. 644.

The ordinance relied on by plaintiff is as follows:

"Every locomotive engine, railroad car or train of cars
running in the night time on any railroad track in said city,
shall have and keep, while so running, a brilliant and con-
spicuous light on the forward end of such locomotive en-
gine, car, or train of cars. If such engine or train be back-
ing, it shall have a conspicuous light on the rear car or
engine so as to show the direction said car is moving."

The powers of the city council of the city of Chicago are enumerated in section 1 of article 5, chapter 24, of the statutes. Hurd's Rev. Stat. 1903, p. 291. The only parts of that section which apply to railroads are clauses 26th and 27th, which are as follows:

"Twenty-sixth. To require railroad companies to fence their respective railroads, or any portion of the same, and to construct cattle guards, crossings of streets and public roads, and keep the same in repair, within the limits of the corporation. In case any railroad company shall fail to comply with any such ordinance, it shall be liable for all damages the owner of any cattle or horses or other domestic animal may sustain by reason of injuries thereto while on the track of such railroad, in like manner and extent as under the general laws of this state, relative to the fencing of railroads; and actions to recover such damages may be instituted before any justice of the peace or other court of competent jurisdiction

"Twenty-seventh. To require railroad companies to keep flagmen at railroad crossings of streets, and provide protection against injury to persons and property in the use of such railroads. To compel such railroads to raise or lower their railroad tracks to conform to any grade which may, at any time, be established by such city, and where such tracks run lengthwise of any such street, alley or highway, to keep their railroad tracks on a level with the street surface, and so that such tracks may be crossed at any place on such street, alley or highway. To compel and require railroad companies to make and keep open and keep in repair ditches, drains, sewers and culverts along and under their railroad tracks so that filthy or stagnant pools of water can not stand on their grounds or right of way, and so that the natural drainage of adjacent property shall not be impeded."

These clauses do not, as we think, confer power to impose regulations on railroad companies in respect to switching cars in their private switching yards. In other words, we do not think that either of the clauses confers power to pass such an ordinance as that in question, in respect to railroad switching yards. By a familiar principle, the enumeration of powers which may be exercised in respect to railroad companies, excludes, by necessary implication,

powers not enumerated. The only doubt in our minds is with regard to the concluding language of the first sentence in clause 27th, viz: "and provide protection against injury to persons and property in the use of such railroads." But we think in view of the reference to crossings, in the preceding part of the sentence, that the language quoted was not intended to apply to private switch yards. However, if the language is doubtful, the power is not granted, because, as Justice Black said, in Commonwealth v. E. & N. E. R'd Co., 27 Penn. St. 339, "A doubtful charter does not exist; because whatever is doubtful is decisively certain against the corporation." Moreover, it is not our opinion that the city had in its mind railroad switch yards, but only public places where the public might be expected to be. Such an ordinance is so unusual, in respect to private grounds, that, if intended to apply to them, they would naturally be mentioned. We think the ordinance was intended to apply to regularly made up trains going out of and coming into the city, or passing from one place to another in the city, or to such trains backing, when the rear car would be continuously the rear one, so that a light might be continuously on it, which is not the case when cars are being switched in a railroad yard. Suppose that in the present case three cars were being backed west, the cars being intended for different tracks, the first rear car would be the one farthest from the engine, and when it was delivered on its destined track, then the one behind it would be the rear one, and so on to the third, thus requiring constant changes of the light, and involving inconvenience and delay in the work. The deceased, as we have stated, had worked in the switching yards three weeks, every day and every night, except Sunday nights, and had worked in the part of the yard where the accident happened before the accident. During all that time the conditions in the yard, including the absence of light from the rear car while being backed, were the same, and he made no complaint. The facts being undisputed, it is a question of law whether he assumed the risk of the existing conditions, and our

opinion is that he did. This view we think fully sustained by the opinions in the following cases : Lake Erie & W. R'd. Co. v. Wilson, 189 Ill. 89; I. B. & W. R'd Co. v. Flanigan, 77 ib. 365; C. & N. W. Ry. Co. v. Donahue, 75 ib. 106; C. B. & Q. R'd Co. v. Camper, 199 ib. 569.

Even though the ordinance in evidence applies to railroad switching yards, and the defendants violated it, the deceased, having known that no light was maintained on the rear car while being backed, during the three weeks he worked in the yard, and not having made any complaint, assumed the risk of the absence of such light. Browne v. Siegel, Cooper & Co., 191 Ill. 226, 231-334.

We find no error in the rulings of the court on evidence which are noticed in the argument of plaintiff's counsel.

Our conclusions are that there is no evidence in the record which, with all inferences legitimately deducible from it, fairly tends to prove the plaintiff's case, and that the deceased assumed the risk of the conditions existing in the switching yard while he worked there.

The refusal of plaintiff's motion for leave to withdraw a juror is assigned as error. The record shows that March 7, 1905, an order was entered, by agreement of the parties, setting the cause for trial April 4, 1905; but that it was not reached for trial till June 14, 1905. Next after plaintiff put in evidence the city ordinance, which was the last evidence introduced, the plaintiff's counsel requested the court to let the case go over till the next morning to give them time to produce as a witness Michael Lynch, the fireman of the switching crew, who had not then been subpoenaed, which the court did, saying: "I will give you an opportunity to bring him in to-morrow morning at half past nine." On the next morning plaintiff's counsel moved for leave to withdraw a juror, and presented in support of the motion a subpoena for George Shoup, Michael Lynch and William Klingle, issued June 14, 1905, indorsed on which is an affidavit of William H. Maher. The affidavit is so inconsistent and confusing in some respects, that we

deem it inexpedient to state its substance, and therefore copy it here as it appears in the record, omitting venue:

"William J. Maher being first duly sworn, upon his oath says that the within subpoena was placed in affiant's hands for service at the time the jury was sworn to answer questions upon their *voir dire.* That affiant immediately went with said subpoena to the home of the within named Michael Lynch. That said Lynch was then absent therefrom, but the wife of said Michael Lynch was there. That affiant read said subpoena to her and explained the contents thereof. That said home of said Lynch is in the City of Chicago and within five miles of the Court House of this County. That said call took place at about 12:30 o'clock P. M. of June 14, 1905. That affiant again called at said home of said Michael Lynch with the within subpoena in his possession at about 5:30 o'clock P. M. of June 14, 1905, and again asked for said Michael Lynch. That said Michael Lynch was then absent from said home. That affiant again, at said last mentioned hour, found the wife of said Lynch at said house, and was informed by her that said Michael Lynch had started for the office of Winston, Payne and Strawn a few minutes before affiant's first call. Affiant then left with said Mrs. Lynch a copy of said subpoena and the sum of one dollar and ten cents witness fees, for said Michael Lynch, which Mrs. Lynch received and told affiant that she would hand said subpoena and said fee to said Michael Lynch as soon as she should see him. That affiant again called at the house of said Lynch at 8:30 A. M. of the 15th day of June, 1905. That said Michael Lynch was then absent from his home and his said wife told affiant that said Michael Lynch had returned home about two o'clock P. M. of June 14, 1905, and had been sent by his employer, the Chicago Junction Railway Company, to Hammond, Indiana."

The court very properly, as we think, denied the motion. A motion for leave to withdraw a juror is, in effect, a motion for a continuance, because a continuance is the result if the motion is allowed. The affidavit shows no diligence. Although the cause was set for trial on April 14, 1905, and was not called for trial till June 14, 1905, no attempt was made by the plaintiff or her counsel, so far as appears in the record, to have Lynch subpoenaed until June 14th, and after the last evidence in the record had been

put in. There is no statement in the affidavit as to what Lynch would testify if present, and the affidavit is, in other respects, insufficient. Counsel for plaintiff stated to the court what they expected to prove by Lynch, but the statement was merely oral and not under oath, and, therefore, cannot be considered. The overruling of plaintiff's motion for a new trial was also proper.

The judgment will be affirmed.

*Affirmed.*